In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 21-2325

SAINT ANTHONY HOSPITAL,

*Plaintiff-Appellant*,

*v.*

THERESA A. EAGLESON, in her official capacity
as Director of the Illinois Department of
Healthcare and Family Services,

*Defendant-Appellee*,

and

MERIDIAN HEALTH PLAN OF ILLINOIS, INC., et al.,

*Intervening Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-02561 — **Steven Charles Seeger**, *Judge*.

———————————

ARGUED FEBRUARY 15, 2022 — DECIDED JULY 5, 2022

———————————

Before WOOD, HAMILTON, and BRENNAN, *Circuit Judges*.

HAMILTON, *Circuit Judge*. In recent years, Illinois has
moved its Medicaid program from a fee-for-service model,

where a state agency pays providers' medical bills, to one dominated by managed care, where private insurers pay medical bills. Most patients of plaintiff Saint Anthony Hospital are covered by Medicaid, so Saint Anthony depends on Medicaid payments to provide care to patients. Saint Anthony says it is now in a dire financial state. Over the last four years, it has lost roughly 98% of its cash reserves, allegedly because managed-care organizations (MCOs) have repeatedly and systematically delayed and reduced Medicaid payments to it.

Saint Anthony contends in this lawsuit that Illinois officials owe it a duty under the federal Medicaid Act to remedy the late and short payments. In a thoughtful opinion, the district court dismissed the suit for failure to state a claim for relief. *Saint Anthony Hospital v. Eagleson*, 548 F. Supp. 3d 721 (N.D. Ill. 2021). We see the case differently, however, especially at the pleadings stage. We conclude that Saint Anthony has alleged a viable claim for relief under 42 U.S.C. § 1396u-2(f) and may seek injunctive relief under 42 U.S.C. § 1983 against the state official who administers the Medicaid program in Illinois. We appreciate the potential magnitude of the case and the challenges it may present. Like the district judge and Judge Brennan, we can imagine forms of judicial relief that would be hard to justify. We can also imagine some poor ways to handle this case going forward in the district court. But we need not and should not decide this case by assuming that the worst-case scenarios are inevitable.

The State has tools available to remedy systemic slow payment problems—problems alleged to be so serious that they threaten the viability of a major hospital and even of the managed-care Medicaid program as administered in Illinois. If

Saint Anthony can prove its claims, the chief state official could be ordered to use some of those tools to remedy systemic problems that threaten this literally vital health care program. We therefore reverse in part the dismissal of the case and remand for further proceedings.

I.  *Factual and Procedural Background*

In reviewing the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, we accept all well-pleaded allegations as true and draw all reasonable inferences in Saint Anthony's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We are not vouching for the truth of Saint Anthony's account of the facts at this point. Rather, because the defense chose to move to dismiss on the pleadings, it chose to accept for now the truth of Saint Anthony's factual allegations.

A.  *The Illinois Medicaid Program*

The federal Medicaid Act established a cooperative arrangement between the federal government and states to provide medical services to poor residents. 42 U.S.C. § 1396 et seq.; *Bria Health Services, LLC v. Eagleson*, 950 F.3d 378, 380 (7th Cir. 2020); see also *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 541–42 (2012). By agreeing to participate in Medicaid, a state receives financial assistance to help administer the program in exchange for complying with detailed statutory and regulatory requirements. *Bria Health Services*, 950 F.3d at 380. Those requirements are found in the Medicaid Act itself (Title XIX of the Social Security Act) and in regulations promulgated by the Secretary of the Department of Health and Human Services (HHS). See *id.* at 382;

*Rock River Health Care, LLC v. Eagleson*, 14 F.4th 768, 771 (7th Cir. 2021).

Before discussing the relevant statutory requirements at issue here, it is important to understand how Illinois, specifically the Department of Healthcare and Family Services (HFS), administers its Medicaid program. There are two major ways for states to pay providers for services provided to patients covered by Medicaid: fee for service or managed care. In a fee-for-service program, the state pays providers directly based on a set fee for a particular service. See § 1396a(a)(30)(A); Medicaid Program; Medicaid Managed Care: New Provisions, 67 Fed. Reg. 40,989 (June 14, 2002). Under a managed-care program, by contrast, HFS contracts with MCOs (which are private health insurance companies) to deliver Medicaid health benefits to beneficiaries. See 42 U.S.C. § 1396u-2; see also § 1396b(m); 42 C.F.R. § 438 (2020). The state pays the MCO a flat fee per patient per month. The MCO then pays providers for services actually provided to covered Medicaid patients. *Bria Health Services*, 950 F.3d at 381, citing 305 ILCS 5/5-30.1; see also 42 U.S.C. §§ 1396u-2, 1396b(m). Like insurance companies, MCOs are generally entitled to keep the difference between the money they receive from the state and the amounts they pay providers for care of covered patients.

In recent years, Illinois has changed from a fee-for-service system to a system dominated by managed care. Illinois introduced managed care in its Medicaid program in 2006. In 2010, the State spent just $251 million on managed care. By 2019, that number had grown to $12.73 billion. In the meantime, the number of MCOs in Illinois has fallen from twelve to seven.

Federal law establishes requirements for timely Medicaid payments for health care providers. When a state pays claims directly, it must pay 90% of so-called "clean claims" within 30 days and 99% within 90 days. See 42 U.S.C. § 1396a(a)(37)(A). (A "clean claim" is one where the provider has given the payor all information needed to determine the proper payments. *Id.*) When a state relies on MCOs to pay providers, federal law requires that the state's contract with an MCO contain a provision that requires the same 30/90 pay schedule for MCO reimbursements to providers. § 1396u-2(f). (MCOs and providers can opt for a different pay schedule, but Saint Anthony has not agreed to a different schedule with any MCOs.)

The focus of this case is the payment schedule provision, § 1396u-2(f). Saint Anthony contends it is also entitled to relief under a separate Medicaid statute requiring a participating state to "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." § 1396a(a)(8). As we explain below, however, Saint Anthony is not entitled to relief under that clause.

B. *Plaintiff Saint Anthony Hospital*

Saint Anthony is a so-called "safety-net hospital" on the southwest side of Chicago. It provides health care regardless of patients' financial means. See 305 ILCS 5/5-5e.1. Most Saint Anthony patients are on Medicaid. As the Illinois Medicaid system has shifted from fee for service to managed care, the hospital has become ever more dependent on timely payments from MCOs. In recent years, according to Saint Anthony, those payments have repeatedly arrived late, if they arrived at all. As of February 2020, payments of at least $20

million were past due. The impact of late payments can be dramatic. In 2015, Saint Anthony had more than $20 million in cash on hand, which was enough to fund 72 days of operation. As the State increased its reliance on managed care, Saint Anthony saw its cash reserves dwindle. By 2019, Saint Anthony had less than $500,000 cash on hand, enough to cover just two days of operation. Saint Anthony's net revenue per patient also dropped more than 20%.

The MCO payments that eventually arrive are often for less than is owed. Making matters even worse from Saint Anthony's perspective, the payment forms it receives from the MCOs lack the details needed to determine just what is being paid and what is not. The delays and lack of clarity benefit the MCOs: since the State pays the MCOs flat fees per patient and permits them to keep the funds they do not pay out to providers, MCOs have a powerful profit incentive to delay and underpay hospitals like Saint Anthony.

Saint Anthony may not be alone in its experience. Mercyhealth is a regional health-care system and the largest Medicaid provider in Illinois outside of Cook County. Illustrating the potential gravity of the MCO payment problems, in April 2020, Mercyhealth announced it would stop accepting Medicaid patients covered by four of the seven MCOs in Illinois. Decl. of Kim Scaccia ¶ 6, Dkt. 50-1, Ex. 12. That was a drastic step showing the potential threat to the viability of the managed-care model for Medicaid. Mercyhealth said it took this step because those MCOs were delaying and underpaying it to the point that it was losing $30 million per year on Medicaid patients. See also David Jackson & Kira Leadholm, Insurance Firms Reap Billions in Profits While Doctors Get Stiffed for Serving the Poor, Better Government Ass'n (Nov. 8, 2021,

12:00 PM), https://www.bettergov.org/ news/ insurance-firms-reap-billions-in-profits-while-doctors-get-stiffed-for-serving-the-poor/.[1]

Faced with this dire financial situation, Saint Anthony had two paths to seek legal relief from what it sees as systemic defects in the Illinois Medicaid program. One path would be to sue MCOs individually for violating Saint Anthony's contractual right to timely payment. Arbitration provisions in those contracts would likely require arbitration for each individual claim in dispute, which could easily involve many thousands of individual claims each year. This suit represents the second path, seeking a court order to require Illinois to enforce the MCOs' contractual obligations to make timely and transparent payments.

C. *Procedural History*

Saint Anthony filed a two-count complaint under 42 U.S.C. § 1983 against Theresa A. Eagleson, the Director of HFS, in her official capacity. (We refer to Director Eagleson here as HFS or the State.) As relevant here, Count I alleges that HFS is violating the Medicaid Act, including section 1396u-2(f), by failing to ensure that MCOs meet the timely payment requirements. Count II alleges that HFS is violating section 1396a(a)(8) by failing to ensure that the MCOs furnished medical assistance with reasonable promptness. Saint Anthony

---

[1] We may consider the Mercyhealth information in evaluating a Rule 12(b)(6) motion, without converting the motion into one for summary judgment, because the information elaborates on and illustrates factual allegations in the complaint. E.g., *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Mercyhealth also reportedly worked out a compromise with one MCO, Molina, under which it continued to care for Molina-covered Medicaid patients. Decl. of Kim Scaccia ¶ 9, Dkt. 50-1, Ex. 12.

seeks injunctive relief directing HFS to require the MCOs to comply with the 30/90 payment rule, to use transparent remittance forms, and if necessary, to require the State to cancel a contract with an MCO that continues to fail to comply with the timely payment requirements.[2]

HFS moved to dismiss Saint Anthony's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Its chief argument was that none of the statutory provisions grant Saint Anthony any rights enforceable under section 1983, and that even if they did, the factual allegations failed to state a plausible claim for relief. The district court agreed and dismissed the case. 548 F. Supp. 3d 721 (N.D. Ill. 2021).

While the motion to dismiss was pending, Saint Anthony moved to supplement its complaint by adding a due process claim. HFS responded to Saint Anthony's request, arguing that the new claim would fail on the merits. The district court denied Saint Anthony the opportunity to file a reply to defend its proposed claim on the merits. Then, four days after granting the motion to dismiss, the district court denied the motion to supplement as futile, and also because the judge thought the entire case should be concluded by the grant of the motion to dismiss.

In the district court, four MCOs also sought and were granted leave to intervene in the suit. The MCOs asked the

---

[2] Saint Anthony also moved for a preliminary injunction. The district court granted limited discovery before suspending in part actions related to the preliminary injunction motion while it resolved a discovery dispute. The court then granted the motion to dismiss and denied the preliminary injunction motion as moot.

court to stay the lawsuit and compel arbitration. One MCO (Meridian) demanded arbitration with Saint Anthony, but that proceeding was stayed because Meridian had not followed the proper procedures to invoke arbitration. The district court later denied the MCOs' motions as moot after granting the motion to dismiss.

Saint Anthony has appealed the court's dismissal of its section 1396u-2(f) and 1396a(a)(8) claims, as well as the denial of the motion to supplement. We first address Saint Anthony's asserted right to timely payment under section 1396u-2(f). To evaluate Saint Anthony's claim, we walk through each of the so-called *Blessing* factors. Each factor supports Saint Anthony here. We then analyze three remaining issues: Saint Anthony's claim under section 1396a(a)(8), the district court's denial of the motion to supplement, and the intervening MCOs' motion to stay the proceedings in favor of arbitration.

## II. *A Right to Timely Payment*

The central issue here is whether section 1396u-2(f) grants a right to providers like Saint Anthony that is privately enforceable through section 1983. We conclude that the State's duty is to try to ensure that the MCOs actually pay providers in accord with the 30/90 pay schedule—not merely that the contracts between the MCOs and HFS include clauses that say as much on paper. Providers like Saint Anthony have a right under section 1396u-2(f) that is enforceable under section 1983, at least to address systemic failures to provide timely and transparent payments.

### A. *Legal Standard*

We again emphasize that we are reviewing the grant of a motion to dismiss under Federal Rule of Civil Procedure

12(b)(6) for failure to state a claim, so we begin by accepting all well-pleaded allegations as true and drawing all reasonable inferences in Saint Anthony's favor. *Iqbal*, 556 U.S. at 678.

The analysis for possible enforcement of federal statutory rights under section 1983 is familiar. "Section 1983 creates a federal remedy against anyone who, under color of state law, deprives 'any citizen of the United States … of any rights, privileges, or immunities secured by the Constitution and laws.'" *Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012) (omission in original), quoting 42 U.S.C. § 1983. This language "means what it says," *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980), and "authorizes suits to enforce individual rights under federal statutes as well as the Constitution." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005).

Yet not all statutory benefits, requirements, or interests are enforceable under section 1983. A plaintiff seeking redress for an alleged violation of a federal statute through a section 1983 action "must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (remanding for further consideration whether federal statute on child-support obligations created rights enforceable under section 1983); see also *Gonzaga University v. Doe*, 536 U.S. 273, 286 (2002) ("[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit."). Congress must have "*intended to create a federal right*," *Gonzaga*, 536 U.S. at 283, and "the statute 'must be phrased in terms of the persons benefited' with 'an *unmistakable focus* on the benefited class.'" *Planned Parenthood of Indiana*, 699 F.3d at 973, quoting *Gonzaga*, 536 U.S. at 284. It is thus not enough to fall

"within the general zone of interest that the statute is intended to protect" to assert a right under section 1983. *Gonzaga*, 536 U.S. at 283.

To aid in this analysis, courts apply the three "*Blessing* factors" to the statutory text and structure:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Talevski v. Health & Hospital Corp. of Marion County*, 6 F.4th 713, 717 (7th Cir. 2021) (Federal Nursing Home Reform Act granted individual rights enforceable under section 1983, quoting *Blessing*, 520 U.S. at 340–41), cert. granted, No. 21-806, 2022 WL 1295706 (U.S. May 2, 2022).

If these three factors are satisfied, "the right is presumptively enforceable under section 1983." *Id*. at 720. The defendant may overcome this presumption by demonstrating that "Congress shut the door to private enforcement." *Gonzaga*, 536 U.S. at 284 n.4. Congress may foreclose a remedy under section 1983 "either expressly, through specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* (internal quotation marks and

citations omitted); see also *Talevski*, 6 F.4th at 721 (collecting just three cases where the Supreme Court determined that a statutory scheme implicitly foreclosed section 1983 liability).

One final background note: The Medicaid Act is an exercise of Congress's power under the Spending Clause. The Supreme Court has found that section 1983 can be used to enforce rights created in the exercise of the spending power. *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 508–12 (1990) (finding a now-defunct amendment to the Medicaid Act granted plaintiff a private right enforceable under section 1983). Since *Wilder*, the Court has cautioned against finding rights in that context. See *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 330 n* (2015) ("[Plaintiffs] do not assert a § 1983 action, since our later opinions plainly repudiate the ready implication of a § 1983 action that *Wilder* exemplified."); see also *Gonzaga*, 536 U.S. at 283. We made this observation in *Nasello v. Eagleson*: "In the three decades since *Wilder* [the Court] has repeatedly declined to create private rights of action under statutes that set conditions on federal funding of state programs." 977 F.3d 599, 601 (7th Cir. 2020).

But as we clarified most recently in *Talevski*, this trend does not mean that Spending Clause legislation never creates rights enforceable under section 1983. 6 F.4th at 723–26. On the contrary, the Court has not overruled *Wilder*. The later Spending Clause cases in which it has declined to find private rights simply did not satisfy the standards we have discussed. *Id*. at 724. As we said in *Talevski*, "[t]he Court could have saved itself a great deal of time [in *Armstrong*] if it had wanted to establish an unbending rule that Spending Clause legislation *never* supports a private action." *Id.* at 725. Spending Clause legislation or not, the relevant question is the same: "do we

have the necessary rights-creating language to support a private right of action?" *Id.* To answer that question, apply the *Blessing* factors.[3]

B. *Rights Analysis*

With this background in mind, here is the text of section 1396u-2(f), the provision central to this appeal:

> A contract under section 1396b(m) of this title with a medicaid managed care organization shall provide that the organization shall make payment to health care providers for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan under this subchapter who are enrolled with the organization on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title, unless the health care provider and the organization agree to an alternate payment schedule….

42 U.S.C. § 1396u-2(f). The statutory language cross-references sections 1396b(m) and 1396a(a)(37)(A). Section 1396b(m) describes the State's contract with an MCO. Section

---

[3] While this case involves a right under section 1983, not an implied private right of action, *Gonzaga* clarified that "the inquiries overlap in one meaningful respect—in either case we must first determine whether Congress *intended to create a federal right*." 536 U.S. at 283.

1396a(a)(37)(A) declares that a "State plan for medical assistance must"

> (37) provide for claims payment procedures which
>
>> (A) ensure that 90 per centum of claims for payment (for which no further written information or substantiation is required in order to make payment) made for services covered under the plan and furnished by health care practitioners through individual or group practices or through shared health facilities are paid within 30 days of the date of receipt of such claims and that 99 per centum of such claims are paid within 90 days of the date of receipt of such claims.

§ 1396a(a)(37)(A).

We agree with Saint Anthony that section 1396u-2(f) grants providers a right to timely payment from the MCOs that the State must safeguard because the right satisfies all three *Blessing* factors. Also, there is no alternative remedy that would be incompatible with individual enforcement under section 1983. As we explain next in applying the *Blessing* factors, providers are the intended beneficiaries of section 1396u-2(f), enforcing the 30/90 pay schedule would not strain judicial competence, and the statute unambiguously imposes a binding obligation on the State. In addition, while private contract remedies may offer an alternative path to enforcement for individual claims, that path does not foreclose enforcement under section 1983. It is also far from clear that contract

remedies, including arbitration, could provide systemic relief that may be sought more sensibly from state officials under section 1983. We address each point in turn.

1. *Factor One: Intended Beneficiaries*

The first *Blessing* factor asks whether Congress intended section 1396u-2(f) to benefit providers like Saint Anthony and whether it intended that benefit to be a *right*, as distinct from a generalized entitlement. We conclude that both answers are yes.

First, providers are the intended beneficiaries of section 1396u-2(f). The text requires MCOs to contract that they "shall make payment to health care *providers* … on a timely basis." § 1396u-2(f) (emphasis added). No one benefits more directly from a requirement for timely payments to providers than the providers themselves. Cf. *BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d 815, 821 (7th Cir. 2017) ("Who else would have a greater interest than the [nursing facility operators] in the process 'for determination of rates of payment under the [State] plan for … nursing facility services'"? (second alteration and omission in original)).

To resist this conclusion, HFS asserts that the term "health care providers" includes *practitioners* but not *hospitals*. The district judge did not adopt this argument, nor do we. Section 1396u-2(f) cross-references section 1396a(a)(37)(A), which requires that states pay "practitioners" on the 30/90 pay schedule. See *Illinois Council on Long Term Care v. Bradley*, 957 F.2d 305, 306, 308 (7th Cir. 1992). "Practitioners" in that context means individual providers as opposed to institutional ones like Saint Anthony. HFS thus argues that since section 1396u-2(f) requires states to ensure MCOs pay providers "consistent

with the claims payment procedures described in section 1396a(a)(37)(A)," section 1396u-2(f) adopts the 30/90 pay schedule requirement only as to "practitioners." In the State's view, holding that section 1396u-2(f) applies to hospitals as well would exceed rather than be consistent with what section 1396a(a)(37)(A) requires.

The argument is not persuasive. HFS reasons that Congress implicitly and indirectly defined "providers" narrowly—just for purposes of section 1396u-2(f)—through a cross-reference to section 1396a(a)(37)(A) that describes a state's payment obligations to practitioners in a fee-for-service program. That is an improbably subtle reading. A more persuasive reading of the statutory text is that Congress invoked only the payment *procedures* in section 1396a(a)(37)(A), not the *beneficiaries* of that provision. The statutory text explains that payment must be made "on a timely basis *consistent with the claims payment procedures* described in section 1396a(a)(37)(A) of this title." § 1396u-2(f) (emphasis added). Those procedures include the 30/90 pay schedule.

Congress knows how to use cross-references for a definitional purpose in the Medicaid Act. See, e.g., § 1396u-2(a)(1)(B)(i) ("[A] medicaid managed care organization, as defined in section 1396b(m)(1)(A) of this title…."); § 1396u-2(b)(2)(A)(i) ("[T]o provide coverage for emergency services (as defined in subparagraph (B))…."). That is not what occurred here. The language is sufficiently plain here, *United States v. Melvin*, 948 F.3d 848, 851–52 (7th Cir. 2020), and the plain meaning of "health care provider" includes hospitals. Cf. 42 U.S.C. § 1395w–25(d)(5) (enacted as part of the Balanced Budget Act of 1997).

HFS's position is also inconsistent with the provision's purpose as shown in additional statutory language. Section 1396u-2(f) was part of the same Balanced Budget Act of 1997. See Pub. L. No. 105-33, 111 Stat. 251 § 4708(c) (1997). Section 4708(c) is entitled: "Assuring Timeliness of Provider Payments." This language signals that Congress intended section 1396u-2(f) to assure, i.e., to guarantee, timely payment to providers. That understanding is consistent with later congressional action. In 2009 Congress enacted 42 U.S.C. § 1396u-2(h) as part of the American Recovery and Reinvestment Act of 2009. See Pub. L. No. 111-5, 123 Stat. 115, § 5006(d) (2009). That subsection established special rules for "Indian enrollees, Indian health care providers, and Indian managed care entities." § 1396u-2(h). Relevant to our purposes, section 1396u-2(h)(2)(B) cross-references section 1396u-2(f) and describes it as the "rule for prompt payment of providers":

> (2) Assurance of payment to Indian health care providers for provision of covered services
>
>> Each contract with a managed care entity under section 1396b(m) of this title or under section 1396d(t)(3) of this title shall require any such entity, as a condition of receiving payment under such contract, to satisfy the following requirements:
>
> …
>
>> (B) Prompt payment
>>
>>> To agree to make prompt payment (*consistent with rule for prompt payment of providers under section 1396u–2(f) of this title*) to Indian health care

> providers that are participating pro-
> viders with respect to such entity….

§ 1396u-2(h)(2)(B) (emphasis added).

Given this evidence, it would seem odd to construe a pro-
vision Congress intended to assure timeliness of provider
payment as not applying to many providers, as HFS advo-
cates. That would appear to defeat the statute's evident pur-
pose in most cases. We decline to read the text in such a man-
ner. *Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019) ("We
should not lightly conclude that Congress enacted a self-de-
feating statute."). If the text required such a result, that would
be one thing, but we should not adopt such an improbable
reading of the text to reach such an odd result.

In applying the first *Blessing* factor, we next conclude that
section 1396u-2(f) grants providers a right, not merely a gen-
eralized benefit. It is here that we disagree with the district
court. In granting the motion to dismiss, the court determined
that section 1396u-2(f) failed the first *Blessing* factor. The court
invoked *Gonzaga*, asserting that providers received only "a
generalized 'benefit'" from section 1396u-2(f), which "isn't
good enough" to constitute a right enforceable under section
1983. *Saint Anthony Hospital*, 548 F. Supp. 3d at 734, quoting
*Gonzaga*, 536 U.S. at 283. The district court concluded that sec-
tion 1396u-2(f) "itself does not entitle providers to much of
anything, and does not contain any 'explicit rights-creating
terms.'" *Id.*, quoting *Gonzaga*, 536 U.S. at 284.

We read the statute differently. *Gonzaga* provides a useful
contrast regarding rights-creating language. In *Gonzaga*, a for-
mer student sued Gonzaga University and an employee un-
der section 1983 for allegedly violating his rights under the

Family Educational Rights and Privacy Act (FERPA). Part of the statutory language at issue directed the Secretary of Education that "[n]o funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice'" of permitting the release of education records without parents' written consent. *Gonzaga*, 536 U.S. at 287 (alteration in original), quoting 20 U.S.C. § 1232g(b)(1); see also § 1232g(b)(2). That prohibited activity is allegedly what occurred in the case.

The Supreme Court concluded that Congress did not grant an individual whose interests were violated under FERPA a right enforceable through section 1983. Because the statutory provisions did not have an individualized focus, they failed *Blessing* factor one: "[The] provisions further speak only in terms of institutional policy and practice, not individual instances of disclosure. Therefore, as in *Blessing*, they have an 'aggregate' focus, they are not concerned with 'whether the needs of any particular person have been satisfied,' and they cannot 'give rise to individual rights.'" *Gonzaga*, 536 U.S. at 287–88 (internal citation omitted), quoting *Blessing*, 520 U.S. at 343–44. The Court also highlighted that the Secretary of Education could take away funds only if the university did not *substantially* comply with the statutory requirements. This fact contributed to the understanding that the focus was on systemwide performance rather than individual instances of improper disclosure. Finally, since FERPA's provisions spoke only to the Secretary and directed him to withdraw funding from schools that had a "prohibited 'policy or practice,'" the Court determined that their focus was "two steps removed from the interests of individual students and parents." *Id*. at 287 (citation omitted). The provisions therefore failed to confer an individual right enforceable under section 1983.

The opposite is true here. Section 1396u-2(f) is concerned
with whether the needs of particular persons and entities—
providers like Saint Anthony—have been satisfied. The statu-
tory text specifies that the State "shall provide" that MCOs
"shall make payment to health care providers … on a timely
basis." 42 U.S.C. § 1396u-2(f). The focus of section 1396u-2(f)
is not "two steps removed" from the interest of providers. Its
focus is directly on the interest Saint Anthony asserts here: en-
suring that providers receive timely payment from MCOs.
And the provision is not concerned only with whether MCOs
in the aggregate pay providers on the 30/90 pay schedule, but
whether *individual* providers are receiving the payments in
the timeframe promised.

We see this in the provision's close attention to provider-
specific exemptions from the 30/90 pay schedule. Section
1396u-2(f) says that its mandate applies "unless the health
care provider and the organization agree to an alternate pay-
ment schedule." It establishes a personal right to timely pay-
ment, which all providers are entitled to insist upon. Cf.
*Planned Parenthood of Indiana*, 699 F.3d at 974 (Medicaid state
plan requirement permitting all eligible recipients to receive
medical assistance from the provider of their choice estab-
lished a personal right "to which all Medicaid patients are *en-
titled*" but, implicitly, need not accept (emphasis added)). Ei-
ther way, the focus is on the individual provider. The focus is
not on whether MCOs in the aggregate substantially comply
with the timely payment requirement. Section 1396u-2(f) is
thus not just a benchmark for aggregate performance.

That conclusion finds support in our precedents under the
Medicaid statutes. Section 1396a(a)(10)(A) provides that "[a]
State plan for medical assistance must … provide … for

making medical assistance available … to all [eligible] individuals." We have held that the provision confers private rights to individuals enforceable under section 1983. See *Miller v. Whitburn*, 10 F.3d 1315, 1319–20 (7th Cir. 1993); accord, *Bontrager v. Indiana Family & Social Services Admin.*, 697 F.3d 604, 607 (7th Cir. 2012) (reaffirming *Miller*'s rights analysis after *Blessing* and *Gonzaga*). In *Miller*, we found it significant that the State was *required* to provide medical assistance to all eligible individuals. The same is true here, but with respect to timely payments to providers that do not opt out of the 30/90 pay schedule. And in *Wilder*, the statute, like the statute here, required states to provide for payment to health care providers: "a state plan" must ensure "'payment … of the *hospital* services, *nursing facility* services, and services in an *intermediate care facility* for the [recipients] under the plan.'" 496 U.S. at 510 (omission in original), quoting 42 U.S.C. 1396a(a)(13)(A) (1982 ed., Supp. V). The Supreme Court concluded that this statutory language granted rights to health care providers enforceable under section 1983. See *id.* at 524. *Wilder* may lie close to the outer edge of the line for section 1983 cases under Spending Clause legislation, but recognizing the rights-creating language in section 1396u-2(f) does not push that logic any further.

At bottom, section 1396u-2(f) defines the minimum terms of the provider's right to timely payment and is provider-specific. It uses "individually focused terminology," *Gonzaga*, 536 U.S. at 287, unmistakably "phrased in terms of the persons benefited," *id.* at 284, quoting *Cannon v. University of Chicago*, 441 U.S. 677, 692 n.13 (1979), and satisfies *Blessing* factor one.

### 2. *Factor Two: Administration*

*Blessing* factor two requires a plaintiff to show that "the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence." *Talevski*, 6 F.4th at 719. HFS does not appear to contest whether section 1396u-2(f) satisfies this standard, nor could it. Saint Anthony argues that the State violated its right to timely payment by failing to abide by section 1396u-2(f)'s statutory mandate of trying to ensure that the MCOs are paying providers in line with the 30/90 pay schedule. Determining whether payments met the 30/90 pay schedule is "administrable," "fully capable of judicial resolution," and "falls comfortably within the judiciary's core interpretative competence." *Planned Parenthood of Indiana*, 699 F.3d at 974.

### 3. *Factor Three: Obligation*

The third *Blessing* factor asks whether section 1396u-2(f) unambiguously imposes a binding obligation on HFS. This requires answering two questions: (1) what is HFS's duty under the statute, and (2) is that duty mandatory?

In a typical private right dispute, the emphasis is on the second question. See, e.g., *BT Bourbonnais Care*, 866 F.3d at 822. Section 1396u-2(f) contains mandatory language, however: "A [State contract] … with a medicaid managed care organization *shall* provide that the organization *shall* make payment to health care providers … on a timely basis…." 42 U.S.C. § 1396u-2(f) (emphasis added). The double use of "shall" rebuts the notion that the State's obligation is anything less than mandatory. But what exactly is the State's obligation here?

Section 1396u-2(f) requires the State's contracts with the MCOs to require that the MCOs pay providers on the 30/90 pay schedule. HFS asserts, and the partial dissent agrees, that section 1396u-2(f) does not impose a duty on the State even to try to ensure that MCOs actually do what their contracts say. HFS's theory is that the statute requires only that a provision in the paper contract specify the timely payment obligation. The State can then sue MCOs for breach of contract if they fail to pay providers according to the 30/90 pay schedule, and providers are entitled to enforce their own contractual rights as they see fit. In HFS's view, nothing in section 1396u-2(f) requires the State itself do anything more to ensure prompt payment. Put differently, if the contract between an MCO and the State contains a clause ensuring timely payment for providers on the 30/90 pay schedule, the State contends it has met its duty under section 1396u-2(f), regardless of actual performance.

We do not read section 1396u-2(f) as permitting such a hands-off approach. Nor would a reasonable state official deciding whether to accept federal Medicaid money have expected she could take that hands-off approach to MCO payments to providers. When interpreting statutes, often the "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *King v. Burwell*, 576 U.S. 473, 486 (2015), quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). We must read texts "in their context and with a view to their place in the overall statutory scheme." *Id.*, quoting *Brown & Williamson*, 529 U.S. at 133; see also *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and

with a view to their place in the overall statutory scheme."). And to the extent possible, we must "ensure that the statutory scheme is coherent and consistent." *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 222 (2008).

Interpreting section 1396u-2(f) as only a "paper" requirement conflicts with these principles of statutory interpretation. HFS is correct that Congress intended MCOs to "assume day-to-day functions previously performed by States under a traditional fee-for-service model." Appellee's Br. at 30. But Congress did not intend for MCOs to go unsupervised. It has long been obvious to all that under the managed-care system of Medicaid, MCOs have a powerful incentive to delay payment to providers for as long as possible and ultimately to underpay to maximize their own profits. It's a classic agency problem: MCOs are expected to act in the providers' interests, but their interests are not the same. Regarding timely payments, they are in direct conflict. The Medicaid Act contains several provisions to counteract that problem in addition to section 1396u-2(f). They help inform our understanding of the particular provision in dispute here.

The statute also imposes reporting and oversight responsibilities on states. For example, section 1396b(m)(2)(A)(iv) requires a state's contract with an MCO to permit the state "to audit and inspect any books and records" of an MCO related to "services performed or determinations of amounts payable under the contract." Section 1396u-2(c)(2)(A)(i) further specifies that a state's contract with an MCO must provide for an "annual (as appropriate) external independent review" of the "timeliness" of MCO "services for which the organization is responsible," including payments. The Medicaid Act thus requires HFS to take steps to monitor MCO payment activities

to gather performance data and to understand how the system is functioning.

The Medicaid Act further specifies actions a state can take when an MCO underperforms. See § 1396u-2(e). The State can put an MCO on a performance plan, for example. As discovery in this case revealed, HFS took this step recently with CountyCare, an MCO, after CountyCare paid only 40% of claims within 30 days and only 62% of claims within 90 days. The CountyCare case turned up evidence of the agency problem in action. The State found that CountyCare's Medicaid money was improperly diverted from the Medicaid program to pay other county government bills rather than health care providers.[4]

In such a case, if an MCO has "repeatedly failed to meet the requirements" of its contract with the State and the requirements in section 1396u-2, "the State shall (regardless of what other sanctions are provided) impose the sanctions described in subparagraphs (B) and (C) of paragraph (2)." § 1396u-2(e)(3). Subparagraph (B) details the appointment of temporary management to oversee the MCO, and subparagraph (C) permits individuals enrolled with the MCO to terminate enrollment without cause. § 1396u-2(e)(2)(B)–(C).

Federal Medicaid regulations add to the State's responsibilities here. For instance, 42 C.F.R. § 438.66(a) (2016) provides: "The State agency must have in effect a monitoring

---

[4] As with the information mentioned above about Mercyhealth, we may also consider the CountyCare information in evaluating the Rule 12(b)(6) motion without converting the motion into one for summary judgment. The information elaborates on (and illustrates) factual allegations in the complaint. E.g., *Geinosky*, 675 F.3d at 745 n.1.

system for all managed care programs." Section 438.66(b)(3) specifies that the State's monitoring system "must address all aspects of the managed care program, including the performance of each MCO … in … [c]laims management." It's hard to imagine a more central aspect of claims management than timely payments. Saint Anthony alleges here that HFS is simply failing to collect the required data on the timeliness of MCO payments.

These responsibilities support the conclusion that Congress intended for states to try to ensure that the right to timely payment in section 1396u-2(f) is honored in real life. The timely payment rule is more than a paper requirement. The more coherent reading of the statute as a whole is that Congress intended the State to engage in these reporting and oversight responsibilities, and if it becomes evident that MCOs are systematically not paying providers on a timely basis, then the State would have an obligation to act under section 1396u-2(f) to secure providers' rights. These mandatory oversight responsibilities would make little sense if that were not the case. The provision's mandatory language, coupled with the additional oversight and reporting responsibilities, supports the reading that section 1396u-2(f) must be doing more than imposing merely the formality of contract language. Providers' right to timely payment must exist in practice.

HFS counters, and the partial dissenting opinion agrees, that the duty imposed by section 1396u-2(f) is at the very least ambiguous. HFS points to *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981), which taught that Congress can impose conditions on grants of federal money only if it does so "unambiguously" and "with a clear voice." In HFS's

view, if Congress wanted to impose the significant duty on states that Saint Anthony advocates, it should have done so more explicitly. Section 1396u-2(f) is not a clear statement, it's ambiguous, and therefore cannot carry the weight Saint Anthony gives it. So says HFS.

We appreciate the point, but we think Congress spoke sufficiently clearly here. The clear-statement rule explains that "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291, 296 (2006), quoting *Pennhurst*, 451 U.S. at 17. To determine whether Congress spoke clearly in this case, we "must view [section 1396u-2(f) and the Medicaid Act] from the perspective of a state official who is engaged in the process of deciding whether the State should accept [Medicaid] funds and the obligations that go with those funds." *Id.* Any state official planning to launch a managed-care program would have understood that the state would have to try to ensure that providers receive prompt payment from MCOs. Such an official would not reasonably have concluded that Congress intended that the "rule for prompt payment of providers" would be only a proverbial paper tiger. See § 1396u-2(h)(2)(B) (describing section 1396u-2(f) as the "rule for prompt payment of providers"). That position conflicts with the State's oversight and reporting obligations and its enforcement duties under the Medicaid Act.

HFS also argues that section 1396u-2(f) cannot impose this duty on the State because it "would negate[] section 1396u-2(e)'s express grant to States of discretion to seek termination of an MCO's contract for violating section 1396u-2[f] or its contract with the State." Appellee's Br. at 27. The argument

highlights a key issue in this appeal and one that helps explain
our disagreement with the district court and the partial dis-
sent.

Saint Anthony requested several forms of relief in its com-
plaint. One of those was canceling a contract with an MCO
that fails to pay on time after State intervention. HFS argues
that forcing it to cancel a contract with an MCO because it did
not meet the 30/90 pay schedule would infringe on the State's
discretion to decide when it will terminate such a contract,
which is expressly preserved by the statute. See § 1396u-
2(e)(4)(A) ("In the case of a managed care entity which has
failed to meet the requirements of this part or a contract under
section 1396b(m) or 1396d(t)(3) of this title, the State shall have
the authority to terminate such contract…."). In HFS's view,
that means section 1396u-2(f) cannot impose a duty on the
State to ensure providers receive timely payment because it
might require the State to take action that is expressly re-
served to its discretion.

We are inclined to agree with HFS that a district court
could not force the State to cancel a contract with an MCO.
Canceling a contract with any one of the seven MCOs in Illi-
nois might well cause a "massive disruption" to the State's
Medicaid program. Appellee's Br. at 28. HFS and only HFS
has the discretion to decide when and why it will invite that
type of disruption. Section 1396u-2(e)(4)(A) is clear on that
point. See also 42 C.F.R. §§ 438.708 (when states can terminate
an MCO contract), 438.730 (CMS can sanction an MCO by
denying payment). To the extent that Saint Anthony requests
such relief, we doubt the district court has authority to impose
it, though we need not answer that question definitively at
this stage, on the pleadings. Perhaps sufficiently egregious

facts might convince us otherwise, but that question about a worst-case scenario can be addressed if and when it actually arises and matters.

Continuing with the theme of assuming the worst, HFS and the partial dissent also argue that reading this duty into section 1396u-2(f) would lead to the district court acting effectively as the Medicaid claims processor for the State. In a parade of horribles, that's the prize-winning float. Given the practical difficulties in judicial enforcement that would come with recognizing a duty here, HFS contends, such a duty could not be what Congress intended. We agree that any form of retail-level relief, i.e., requiring the district court to adjudicate issues at the claim-by-claim level, would strain judicial resources and seem to conflict with the arbitration clauses in the contracts between the MCOs and Saint Anthony. A process that required a district judge to micro-manage claims would be inappropriate here.

These two limits on remedies in a section 1983 action do not persuade us, however, that we should affirm dismissal on the theory that the State has no duty at all to ensure timely payment under section 1396u-2(f). HFS can take other steps at the system level to address chronic late and/or short payments by MCOs. Those actions would neither force the State to cancel an MCO contract nor turn the district court into a claims processor. If Saint Anthony can prove its claims of systemic delay and/or underpayment, we are confident that the district court could craft injunctive relief to require HFS to do *something* to take effective action.

We draw helpful guidance on these issues of potential equitable relief from *O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016). There, we affirmed a preliminary injunction against

Illinois officials in a suit brought by Medicaid beneficiaries who sought to enforce different sections of the Medicaid Act requiring the State to find nurses to provide home nursing for children enrolled in Medicaid. HFS argued in *O.B.* that it had no obligation to find nurses (or to act at all). We rejected that argument:

> Certainly the defenses thus far advanced by HFS are weak. The primary defense is that nothing in the Medicaid statute "required [HFS] to ensure that Plaintiffs would receive medical care from nurses in their homes." But it was HFS that decided that home nursing was the proper treatment for O.B., the other named plaintiffs, and the other members of the class.

*Id.* at 840 (alteration in original).

We recognized in *O.B.* the difficulties state officials faced in providing the needed nurses. There was no guarantee that compliance with the injunction would solve the plaintiffs' problems. In affirming the preliminary injunction, though, we explained that the injunction "should be understood simply as a first cut: as insisting that the State do *something* rather than nothing to provide in-home nursing care for these children." *Id.* at 842; see also *id.* at 844 (Easterbrook, J., concurring) ("All a district court can do in a situation such as this is require [the State] to start trying."). If Saint Anthony can prove its claims of systemic delay and/or underpayment, the same is true here. The State decided to switch to a Medicaid program dominated by managed care. The State cannot now claim it has no obligation to ensure that Medicaid providers serving patients under that program receive timely payment. *O.B.* instructs that where HFS has a duty, a district court may order

it to do something when that duty is not being met, at the first cut. The court may then need to supervise the effects of the injunction and the State's response and adjust the court's orders as circumstance and equity may require. The district court should not let the perfect become the enemy of the good, nor should the possibility that a first cut at an injunction might not work sufficiently justify a denial of any relief at all.

To be clear, we are not suggesting that an injunction ordering the State officials literally to do only "something" would be sufficient. Federal Rule of Civil Procedure 65(d)(1) requires an injunction to "describe in reasonable detail … the act or acts restrained or required." At the same time, we have often recognized that district courts have substantial equitable discretion in crafting injunctions so that they are both understandable by those enjoined and effective to accomplish their purposes. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 384–85 (7th Cir. 2018); *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 843 (7th Cir. 2012), citing *Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302, 307 (7th Cir. 2010). If Saint Anthony can prove systemic failures by MCOs to comply with the 30/90 payment schedule with reasonably transparent payment information, we would expect the district court to explore with the parties what steps the State officials could reasonably be expected to take to correct those systemic failures before framing an appropriate and effective injunction. And if such an injunction later needed to be modified based on experience, the district court would have ample power to do so at the request of a party or on its own motion.

*O.B.* also makes clear that a district court can craft injunctive relief within its equitable powers and discretion even in circumstances where some more drastic remedial measures

may be off the table. See *O.B.*, 838 F.3d at 844 (Easterbrook, J., concurring) (identifying certain forms of relief that were off limits while also instructing the district judge to try different things and to "keep tabs on what is happening and adjust the injunction as appropriate" to secure relief for plaintiffs); accord, *Rizzo v. Goode*, 423 U.S. 362, 376–77 (1976) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." (internal quotations and citation omitted)). Federal Rule of Civil Procedure 54(c) offers relevant guidance here, providing that any final judgment other than a default judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." The converse is also true, of course. If a party demands relief in its pleadings that is not available, such a demand does not poison the well to defeat relief to which the party is otherwise entitled. If Saint Anthony succeeds on the merits of its claims, we believe the district court here will be able to craft a remedy to push the State toward complying with its duty to provide for timely and transparent payments to Saint Anthony.

We recognize that part of the rationale for adopting the managed-care model was to ease the State's administrative burden. Measures that would force HFS to take a more aggressive oversight role could reduce some of the administrative benefits the State hoped to gain by the switch to managed care. As we have explained, however, the Medicaid Act permits states to shift major Medicaid duties to MCOs but does not allow States to wash their hands of effective oversight. On the contrary, the Medicaid Act shows that Congress recognized the troubling financial incentives inherent in a managed-care system and the need for effective oversight. Recall

that the Medicaid Act requires the State to audit and inspect MCO books and records, to perform annual external reviews of payment timeliness, and to implement sanctions if an MCO is underperforming.

Saint Anthony alleges here that HFS is falling far short on those oversight and monitoring duties. HFS cannot avoid those duties altogether on the theory that Saint Anthony also asked for certain remedies that might not be available in this section 1983 action. If the State cannot manage to carry out those oversight and monitoring duties, an effective remedy to enforce the requirements would honor the bargain struck when Illinois accepted funding for Medicaid in the first place.

The partial dissent also criticizes our focus on systemic failures and judicial relief to address such failures, arguing that there is no textual basis for that focus. The partial dissent portrays the choice as an either-or: either the district court must prepare to take over day-to-day claims management, or no judicial relief is available at all. The case is difficult, but the judicial options are not so limited. First, the Medicaid statute and the relevant contracts recognize that perfection is not required. That much is clear from the 30/90 pay schedule itself: pay 90% of clean claims within 30 days and 99% within 90 days. Second, HFS itself seems to be able to tell the difference between minor problems and systemic ones, and there is reason to think it can identify systemic measures that can be effective without having HFS (let alone the district court) take over day-to-day claims management. As noted above, for example, HFS took action against CountyCare based on data showing that CountyCare "was not regularly meeting" the 30/90 pay schedule. Decl. of Robert Mendonsa ¶ 16, Dkt. 86-10. HFS investigated, demanded that CountyCare adopt a

"Corrective Action Plan," and reported that a few months after adopting such a plan, CountyCare "significantly reduced the number of outstanding claims that [were] older than 90 days." *Id*. ¶¶ 17–21. We need not and should not adopt a mathematical definition of "systemic" failures at the pleadings stage. That problem can await further factual development. (To use a metaphor often used in the law, a person can *usually* tell the difference between being in mountains, in foothills, or on a plain even if there are no sharp boundaries between mountains, foothills, and plains.)

For these reasons, we conclude that section 1396u-2(f) satisfies the third *Blessing* factor because the State has a binding obligation to try to ensure prompt payment for providers from MCOs.

### 4. *Alternative Remedial Scheme*

Since section 1396u-2(f) satisfies the three *Blessing* factors, the right to prompt payment is presumptively enforceable under section 1983. *Talevski*, 6 F.4th at 720. HFS can rebut this presumption by "showing that Congress specifically foreclosed a remedy under § 1983 … expressly, through specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983[.]" *Id.* (alteration and omission in original), quoting *Gonzaga*, 536 U.S. at 284 n.4. HFS has not identified any express language in the Medicaid Act foreclosing private rights enforcement. HFS relies instead on the implicit approach, which is a "difficult showing." *Blessing*, 520 U.S. at 346.

If the MCOs are failing to abide by the contractual terms, says HFS, Saint Anthony should just enforce its own contracts

with them. And providers like Saint Anthony are "in the best position" to "enforce their right to timely payment directly under their contracts with MCOs." Appellee's Br. at 29. As HFS sees the matter, there is no need to permit section 1983 actions to "achieve Congress's goal of enabling Medicaid providers to receive timely payment." *Id.*

A contractual remedy may offer some prospect of relief to a provider like Saint Anthony. But HFS has not convinced us that "allowing [section 1983] actions to go forward in these circumstances 'would be inconsistent with'" a "carefully tailored [Congressional] scheme.'" *Blessing*, 520 U.S at 346, quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989). Rather, Congress intended the State's Medicaid plan to ensure timely payment to providers. If, as Saint Anthony alleges, the plan has been failing to meet this requirement, repeatedly and systematically, we would not be surprised if provider-MCO arbitrations would do little to correct that problem on a systemic basis.

There is good reason to doubt that contractual remedies alone can vindicate the provider's right to prompt payment. Saint Anthony files many thousands of Medicaid claims each year. If most claims are not paid on time, Saint Anthony's option under the contract is to sue the MCO and/or to submit each claim for arbitration. Many other Medicaid providers across Illinois might need to do the same with each of the seven MCOs. That avenue represents a claim-by-claim adjudication on the individual provider-MCO level, across many thousands of claims, all in their own arbitrations. It's not immediately obvious that this dispute-resolution system would even be manageable, let alone superior to a systemic solution implemented by HFS. At the very least, we are not persuaded

that Congress, implicitly through the contractual model, cre-
ated "a comprehensive enforcement scheme that is incompat-
ible with individual enforcement under [section 1983]." *Gon-
zaga*, 536 U.S. at 285 n.4.

For these reasons, we conclude that section 1396u-2(f) sat-
isfies *Blessing* and contains a right to timely payment that is
enforceable under section 1983. Saint Anthony has plausibly
alleged a violation of such a right that would support a claim
for relief. We therefore reverse the district court's dismissal of
this claim.

We emphasize that this decision is based on the pleadings.
This is a hard case with high stakes for the State, Medicaid
providers, and Medicaid beneficiaries. We also recognize the
potential magnitude of the case and the challenges it may pre-
sent to the district court. If it turns out that resolving this dis-
pute would actually require the district court to analyze each
late claim, effectively taking on the role of the State's Medi-
caid claims processors, or that effective relief could come only
by canceling a contract with an MCO, then we may face a dif-
ferent situation. But we do not know at this point what direc-
tion the course of this litigation will take. HFS has not con-
vinced us that we must decide whether Saint Anthony has al-
leged a viable claim today by assuming only the worst-case
scenarios will emerge down the line. If Saint Anthony can
support its factual allegations about systematically late and
inadequate payments, we believe the district court could ex-
ercise its equitable discretion to fashion effective relief. The
corrective action plan that HFS demanded from CountyCare
may provide a starting point, adaptable to the circumstances
of different MCOs.

III. *Additional Issues*

We have three issues left to discuss: Saint Anthony's claim in Count Two under section 1396a(a)(8), the district court's denial of Saint Anthony's motion to supplement the complaint, and a possible stay in favor of arbitration. We address each in turn.

A. *Count Two*

Unlike Saint Anthony's claim under section 1396u-2(f), its claim under section 1396a(a)(8) is not viable. Section 1396a(a)(8) does not provide Saint Anthony any enforceable rights under section 1983 because it does not contain any rights-creating language for *providers*. In the jargon of this niche in the law, it fails to satisfy *Blessing* factor one.

Recall that the first *Blessing* factor requires Congress to have intended the plaintiff to be the beneficiary of the provision in question. *Blessing*, 520 U.S. at 340. Section 1396a(a)(8) requires a state to "provide that all individuals wishing to make application for medical assistance under [the state's Medicaid system] shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). The key language in this provision is "individuals," used in two places. At the beginning, the text specifies that "all *individuals* wishing to make application for medical assistance" must have the opportunity to do so. At the end, it says that "all eligible *individuals*" must receive that assistance promptly. We agree with other circuits that have concluded that individuals are the intended beneficiaries of this provision. See, e.g., *Romano v. Greenstein*, 721 F.3d 373, 378–79 (5th Cir. 2013) (concluding that individuals were the "clearly" intended

beneficiaries of section 1396a(a)(8) and that the provision gave individuals a private right of action); *Doe v. Kidd*, 501 F.3d 348, 356–57 (4th Cir. 2007) (same); see also *Nasello*, 977 F.3d at 602 (collecting cases).[5]

Saint Anthony asserts that "individuals" could also include providers. It argues that dictionary definitions of "individual" include a "single … thing, as opposed to a group," which includes a single provider. Appellant's Br. at 39, quoting *Individual*, Black's Law Dictionary (11th ed. 2019). Medical assistance is also defined in the statute to include "payment." 42 U.S.C. § 1396d(a). Saint Anthony puts these pieces together to argue that section 1396a(a)(8) includes requiring MCOs to furnish "medical assistance" (defined as including "payment" for medical services) to "individuals" (defined as including "hospitals") with "reasonable promptness."

The argument is not convincing. For one, interpreting "individual" to include a "hospital" is a long stretch of the language. Saint Anthony's argument is also inconsistent with other parts of section 1396a(a)(8) and surrounding statutory provisions. Section 1396a(a)(8) says that states must "provide that all individuals wishing to make *application* for medical assistance" can do so. (Emphasis added.) Providers do not make application for medical assistance; individuals do. See 42 C.F.R. § 435.4 (2015) ("Applicant means an individual who is seeking an eligibility determination for himself or herself through an application submission or a transfer from another agency or insurance affordability program."). As the district court correctly identified, the texts surrounding

---

[5] We declined to decide this issue in *Nasello* but accepted the premise for the sake of argument. 977 F.3d at 602.

section 1396a(a)(8) use "individuals" repeatedly to refer to natural persons. See *Saint Anthony Hospital*, 548 F. Supp. 3d at 738 (collecting provisions).

Given this statutory evidence, Congress did not speak "with a clear voice" and manifest an "unambiguous[]" intent to confer rights to providers like Saint Anthony under section 1396a(a)(8) through the word "individuals." See *Pennhurst*, 451 U.S. at 17. Section 1396a(a)(8) thus fails the first *Blessing* factor and does not confer a private right to providers that can be enforced under section 1983.

B.  *Saint Anthony's Motion to Supplement the Complaint*

While the motion to dismiss was pending, Saint Anthony moved to supplement its complaint with a claim for deprivation of property without due process of law. Saint Anthony alleged HFS violated its due process rights in two ways, both related to payment transparency: (1) by failing to notify Saint Anthony of the amounts being paid for services provided to Medicaid beneficiaries in the fee-for-service program; and (2) by failing to require MCOs to provide such notice in the managed-care program. Four days after the district court dismissed the existing complaint, the court denied Saint Anthony's motion to supplement.

As a preliminary matter, there is an academic question whether this request should be construed as a motion to supplement under Federal Rule of Civil Procedure 15(d) or a motion to amend under Rule 15(a). Saint Anthony's motion sought to add allegations concerning both post-complaint events (most appropriate as a 15(d) supplement) and some pre-complaint events that came to light in discovery (most appropriate under 15(a)). The distinction between 15(a)

amendments and 15(d) supplements is not important here. District courts have essentially the same responsibilities and discretion to grant or deny motions under either subsection. See *Glatt v. Chicago Park District*, 87 F.3d 190, 194 (7th Cir. 1996) ("[T]he standard is the same."); see also 6A Wright & Miller, Federal Practice and Procedure § 1504 (3d ed.) (explaining that a lack of formal distinction between the two is "of no consequence," and that leave should be freely granted when doing so will promote economic and speedy disposition of entire controversy and will not cause undue delay or unfair prejudice to other parties).

Ordinarily, "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed. We have said this repeatedly." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*, 786 F.3d 510, 519 (7th Cir. 2015) (collecting cases). The decision to deny the plaintiff such an opportunity "will be reviewed rigorously on appeal." *Id.* "Unless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Id.* at 519–20, quoting *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Commission*, 377 F.3d 682, 687 (7th Cir. 2004). Reasons for denying leave to amend include "futility, undue delay, prejudice, or bad faith." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 417 (7th Cir. 2019).

The district court used a procedure here that ran a high risk of error. Saint Anthony requested leave to add the due process claim after minimal discovery and before the court ruled on the pending motion to dismiss. The court entered a

minute order recognizing that "Rule 15(a)(2) provides that the 'court should freely give leave when justice so requires.'" It then ordered HFS to respond, even permitting an oversized brief. HFS responded by arguing the merits of the due process claim, saying in essence that the proposed amendment or supplement would be futile. Futility could be a good reason to deny the amendment or supplement, but then the district court took a wrong turn. It denied Saint Anthony an opportunity to file a reply defending the merits of its proposed due process claim. The court then denied Saint Anthony's motion on futility grounds. This unusual procedure thus denied Saint Anthony a fair opportunity to defend the merits of its supplemental claim—only to lose on the supposed lack of merit. That procedure amounted to an abuse of discretion.

Other aspects of the district court's decision on that motion also point toward reversal. For instance, Saint Anthony's request to supplement the complaint occurred early in the lawsuit. See *Abu-Shawish v. United States*, 898 F.3d 726, 738 (7th Cir. 2018) ("The usual standard in civil cases is to allow defective pleadings to be corrected, *especially in early stages*, at least where amendment would not be futile." (emphasis added)). The district court did not find bad faith by Saint Anthony or prejudice to HFS.

The district court denied the motion in part because it concluded the new claim would expand the scope and nature of the case, which the court thought was "otherwise over." We do not find this rationale persuasive, especially after we have concluded that the case is not otherwise over. The due process claim against the State pertains to the lack of transparency in the Medicaid remittances, based at least in part on new information produced in the limited discovery. Saint Anthony

alleged problems with the remittances in its original complaint, as HFS acknowledges. The new claim added issues related to the fee-for-service aspects of Illinois Medicaid, but that fact alone was not reason enough to deny leave so early in the life of a case and before discovery was in full swing. Courts should not be surprised, and should not respond rigidly, when discovery in a complex case turns up evidence to support a new theory for relief or defense.

In addition, by denying the motion to amend or supplement, the district court put Saint Anthony at risk of serious and unfair prejudice. To the extent the district court might have thought that the due process claim should be presented in a separate lawsuit, Saint Anthony could face serious problems with claim preclusion. See *Arrigo v. Link*, 836 F.3d 787, 798–80 (7th Cir. 2016).[6]

---

[6] In *Arrigo*, the first district court denied plaintiff's motion to amend the complaint to add a related claim, and we affirmed. Then, when the plaintiff tried to bring the claim in a new action, the second district court dismissed it. We upheld that decision, asserting that "allowing Arrigo to proceed here would result in the very prejudice and inefficiency that the denial of the untimely amendment, which we upheld, was intended to avoid." 836 F.3d at 800. We also stressed that "[t]o rule otherwise would undermine the principles animating the doctrines of res judicata and claim splitting, as well as our decision upholding on appeal the denial of the motion for leave to amend." *Id.* In that sense, by prohibiting the supplemental claim here, the district court might have also prevented Saint Anthony from bringing that claim in a future case, all without the opportunity for Saint Anthony to defend the merits of the claim. HFS argues that Saint Anthony's concerns are misplaced because the district court implied that Saint Anthony could bring its due process claim in a future action. It is true that a district court can expressly reserve a claim for future adjudication, see, e.g., *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 896 (7th Cir. 2015); 18 Wright & Miller § 4413, but such an exception requires

At this stage of the proceedings, the only arguable ground for denying Saint Anthony's request to supplement its complaint would have been futility on the merits. The district court did say that it "ha[d] doubts about the legal sufficiency of Saint Anthony's proposed new claim." As noted above, the denial of a plaintiff's first attempt at leave to amend or supplement "will be reviewed rigorously on appeal." *Runnion*, 786 F.3d at 519. Doubts on the merits do not show futility. See, e.g., *id.* at 519–20; *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) ("Generally, if a district court dismisses for failure to state a claim, the court should give the party one opportunity to try to cure the problem, even if the court is skeptical about the prospects for success."). We thus reverse the denial of Saint Anthony's motion to supplement its complaint.

## C. *Arbitration?*

The remaining issue is whether we should stay the case in favor of arbitration, as the intervening MCOs request. A necessary aspect of Saint Anthony's claim against HFS is showing that the MCOs systematically miss the 30/90 pay schedule. The MCOs dispute that allegation, however. They argue that under the contracts, each allegedly late claim presents a factual dispute that must be resolved in arbitration before Saint Anthony's case against HFS can proceed on the merits.

---

the second court to conclude the first court adequately preserved the claim. One could understand why such assurances from HFS, including its post-argument letter promising to forgo a claim preclusion defense in a separate lawsuit, might provide Saint Anthony limited comfort, especially since the district court's stated rationale was based at least in part on a supposed lack of merit.

The district court did not address this issue, and we decline to do so here as well. Both HFS and the MCOs have their distinct obligations to ensure timely payment for providers. While factual issues related to the MCOs appear intertwined with Saint Anthony's claim against HFS, they do not foreclose Saint Anthony's section 1983 action. Faced with chronic late payments, Saint Anthony is entitled to seek relief against HFS as well as against the MCOs.

*        *        *

To sum up, Saint Anthony has alleged a viable right under 42 U.S.C. § 1396u-2(f) to have HFS act to try to ensure timely payments from MCOs, and that right is enforceable in this section 1983 action against HFS Director Eagleson in her official capacity. We REVERSE the district court's dismissal of Count One. Saint Anthony does not have any rights under section 1396a(a)(8). We AFFIRM the district court's dismissal of Count Two. We REVERSE the district court's denial of Saint Anthony's motion to supplement, decline to stay the proceedings in favor of arbitration, and REMAND for proceedings consistent with this opinion.

BRENNAN, *Circuit Judge*, concurring in part and dissenting in part.

I join my colleagues in concluding that 42 U.S.C. § 1396a(a)(8) does not support a private right of action for healthcare providers. And while I agree that under the *Blessing* factors, 42 U.S.C. § 1396u-2(f) creates a private right of action, I part ways with them on the breadth and substance of the State's duty under that statute. An administrative prerequisite that a managed care contract includes deadlines is fundamentally different from a privately enforceable statutory duty to proactively guarantee timely managed care payments to healthcare providers. I also conclude that the district court did not abuse its discretion in denying Saint Anthony's Federal Rule of Civil Procedure 15(d) motion to supplement its complaint.

**I**

Saint Anthony is a hospital in Chicago serving impoverished patients that relies heavily on Medicaid for its funding. Saint Anthony maintains that it has not received timely Medicaid payments from multiple managed care organizations ("MCOs"). Rather than pursue any claims against the MCOs directly through arbitration or litigation as provided for in the Hospital's contracts,[1] Saint Anthony has attempted to bypass the MCOs altogether by suing Illinois under 42 U.S.C. § 1396u-2(f).

---

[1] Saint Anthony has contracts with all seven MCOs in the Illinois managed care program. Each of the four MCOs that intervened in this case has a contract with the Hospital that contain arbitration provisions, three of which are binding.

Section 1396u-2(f) governs contracts between states and managed care organizations under a managed care system. The provision states in relevant part:

> A contract under section 1396b(m) of this title with a medicaid managed care organization shall provide that the organization shall make payment to health care providers … on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title, unless the health care provider and the organization agree to an alternate payment schedule.

42 U.S.C. § 1396u-2(f). The provision that § 1396u-2(f) incorporates—42 U.S.C. § 1396a(a)(37)(A)—lists the payment procedures which apply to a state's fee-for-service system, requiring payment for 90% of clean claims within 30 days and 99% of clean claims within 90 days.

The parties substantially disagree about § 1396u-2(f)'s requirements. They agree that states have a duty to include contractual provisions with MCOs, and there is no dispute that such provisions exist in the underlying contracts here.[2] They also agree that states have a right to enforce that provision. But the parties diverge as to whether states have a privately enforceable *duty* to guarantee that all MCO payments are timely paid to healthcare providers. According to the State, § 1396u-2(f) mandates only that MCO contracts with

---

[2] Saint Anthony might have had an actionable claim under § 1396u-2(f) if it had pleaded that the State's MCO contracts failed to include the required 30-day/90-day payment schedule. But the Hospital admits that the State's contracts do include the necessary payment provisions.

healthcare providers include payment schedules that conform to § 1396a(a)(37)(A)'s 30-day/90-day payment requirement. Saint Anthony believes the statute requires more: states must proactively enforce MCO payments to ensure they are issued on a timely basis.

Before determining the extent of a state's duty under § 1396u-2(f), it is crucial to remember, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Because Medicaid is legislation under the Constitution's Spending Clause, Congress must "speak with a clear voice" before imposing obligations on the states. *Id.* This ensures states exercise their choice to participate in Medicaid knowingly, "cognizant of the consequences of their participation." *Id.* "A state cannot knowingly accept the conditions of the federal funding if that state is unaware in advance of the conditions or unable to ascertain what is expected of it, and therefore we insist that Congress must speak with a clear voice." *City of Chi. v. Barr*, 961 F.3d 882, 907 (7th Cir. 2020). We have described this requirement, which is rooted in federalism concerns, as "rigorous." *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 973 (7th Cir. 2012). Indeed, the Court has shown great reluctance to recognize private rights of action under 42 U.S.C. § 1983 for beneficiaries of federally funded state programs. Since *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990), decided over three decades ago, the Court "has repeatedly declined to create private rights of action under statutes that set conditions on federal funding of state programs." *Nasello v. Eagleson*, 977 F.3d 599, 601 (7th Cir. 2020); *see Talevski v. Health & Hosp. Corp. of Marion Cnty.*, 6 F.4th 713, 718 (7th Cir. 2021), *cert. granted sub nom. Health & Hosp. Corp. v. Talevski*, No. 21-806, 2022 WL

1295706 (U.S. May 2, 2022) ("[N]othing 'short of an unambig-uously conferred right … phrased in terms of the persons ben-efited' can support a section 1983 action." (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002))); *see, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 332 (2015).

With this legal backdrop, consider the text of § 1396u-2(f). Congress mandated that a state's "contract" with an MCO "shall provide" that the MCO make payments to healthcare providers on a timely basis consistent with § 1396a(a)(37)(A)'s 30-day/90-day payment schedule, unless healthcare provid-ers and MCOs agree to an alternate payment schedule. But it is clear that is all the text requires. Section 1396u-2(f) is silent on any ongoing governmental duty to monitor MCO pay-ments or otherwise guarantee that MCOs consistently make prompt payments. As other neighboring statutory provisions show, Congress knows how to impose duties requiring state action.[3] Section § 1396u-2(f) contains no such language.

---

[3] *See, e.g.*, 42 U.S.C. § 1396u-2(a)(3)(A) ("A State must permit an indi-vidual to choose a managed care entity from not less than two such enti-ties …."); 1396u-2(a)(4)(B) ("The State shall provide for notice to each such individual of the opportunity to terminate (or change) enrollment under such conditions."); § 1396u-2(a)(4)(C) ("[T]he State shall establish a method for establishing enrollment priorities in the case of a managed care entity that does not have sufficient capacity to enroll all such individuals seeking enrollment …."); § 1396u-2(a)(4)(D) ("[T]he State shall establish a default enrollment process …."); § 1396u-2(a)(5)(C) ("A State that requires individuals to enroll with managed care entities under paragraph (1)(A) shall annually (and upon request) provide … to such individuals a list identifying the managed care entities …."); § 1396u-2(c)(1)(A) ("[T]he State shall develop and implement a quality assessment and improvement strategy …."); § 1396u-2(d)(1)(B)(i) ("[T]he State … shall notify the Secre-tary of such noncompliance."); § 1396u-2(d)(6)(A) ("[A] State shall require that … the provider is enrolled consistent with section 1396a(kk) of this

Rather, its text describes the contract provision that must be included—for timely payments consistent with deadlines set out in a different statute—not the State's ongoing enforcement duty. This is not surprising given that § 1396u-2(f) pertains to managed care systems, rather than traditional fee-for-service arrangements. As the majority opinion notes, the managed care structure was designed to alleviate the burden on states of managing the "day-to-day" functions previously performed by states under a fee-for-service system.

Review of the Medicaid Act as a whole confirms this reading of § 1396u-2(f). *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 167 (2012) ("The text must be construed as a whole."); *id.* at 180 ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."). In 42 U.S.C. § 1396u-2(e)(4)(A), the statute sets forth "[s]anctions for noncompliance" that states can impose against MCOs who commit enumerated offenses. Among the tools at a state's disposal is the power to terminate a contract with a noncompliant MCO. As the majority opinion admits, the text of § 1396u-2(e)(4)(A) reserves this punitive measure to the discretion of the states. Yet under Saint Anthony's reading of the statute, if an MCO fails to make timely payments to healthcare providers, a state could be *required* to terminate the MCO's contract as a last resort if, as the majority opinion rules, the state has a duty to ensure compliance with the contractual payment schedule. Saint Anthony's only response is that states can "choose the tools to generate compliance" with the payment schedule. But even the Hospital admits—as it must—that terminating an MCO's contract may become

_____

title with the State agency administering the State plan under this subchapter.").

"necessary" as a "final draconian remedy" if other remedial measures prove ineffective.[4]

In addition to lacking a textual basis in § 1396u-2(f), and creating statutory incongruences within the Medicaid Act, Saint Anthony's interpretation threatens to put a tremendous burden on states and the judiciary. Unsuspecting states will be surprised to learn that now they must manage MCOs to guarantee that all payments to healthcare providers are made on a timely basis—the same "day-to-day" administration that a managed care system was supposed to avoid. The duty the Hospital would read into § 1396u-2(f) would obligate trial courts to become de facto Medicaid claims processors for states. Courts will be charged with resolving disputes about which claims are clean and which are not, as well as substantial litigation over the timeliness of paying claims.

Aware of these problems, the majority opinion endorses a third reading of § 1396u-2(f), distinct from either of the interpretations for which the parties advocate. Healthcare providers "have a right under section 1396u-2(f) that is enforceable under section 1983, at least to address systemic failures to provide timely and transparent payments," per the majority opinion. My colleagues hope that qualifying the state's duty to ensure timely payment only when MCO's are *systemically* late in paying healthcare providers will lessen the burden on the states and district courts.

But the majority opinion's interpretation is even further removed from the text of § 1396u-2(f). That provision never mentions—let alone defines—"systemic" failures to make timely payments. While Saint Anthony's position that states

---

[4] Oral Arg. at 43:51–44:22.

must always ensure timely payment is incorrect, its reading at least acknowledges that the statutory text contains no limiting principle—that is, states either have a privately enforceable duty to ensure prompt payment, or they do not. By contrast, the majority opinion introduces a new standard under which victims of the worst MCO offenders may pursue federal claims, but disputes not deemed "systemic"—presumably about a comparatively small number of untimely payments—are not actionable. There is no textual basis for such a conditional duty under § 1396u-2(f), let alone text that is "unambiguous[]" and spoken with a "clear voice." *Pennhurst*, 451 U.S. at 17.

Instead of grounding its interpretation in the text of § 1396u-2(f), the majority opinion looks elsewhere. For example, it states that "Congress did not intend for MCOs to go unsupervised." But that is a false dilemma. By requiring contractual provisions that MCOs make timely payments, § 1396u-2(f) enables a healthcare provider like Saint Anthony to privately enforce their contractual rights against MCOs directly through arbitration or litigation. Recall that Saint Anthony is not without a vehicle to press its arguments about nonpayment of claims. The Hospital has contracts with MCOs, each of which contains a bargained-for arbitration clause. The arbitration with one of the MCOs, Meridian, is currently stayed at the Hospital's request. Further, it is undisputed that states have the authority to intervene and to penalize noncompliant MCOs. The question is not whether Congress intended that MCOs go unsupervised, but whether Congress intended in § 1396u-2(f) that MCOs be supervised via a privately enforceable legal duty, found in that statute, and now recognized in the majority opinion.

As evidenced throughout § 1396u-2, Congress knows how to impose duties requiring state action when it wants to. But language imposing a duty is absent from § 1396u-2(f). "We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005). And as referenced above, unspoken Congressional intent should be an oxymoron when examining whether Spending Clause legislation contains a private right of action.

When the majority opinion does turn to the actual language of the statute, tellingly, it looks only to unrelated provisions in the Medicaid Act, rather than "start[ing] with the specific statutory language in dispute"—here, the text of § 1396u-2(f). *Murphy v. Smith*, 138 S. Ct. 784, 787 (2018); *see King v. Burwell*, 576 U.S. 473, 500–01 (2015) (Scalia, J., dissenting) ("[S]ound interpretation requires paying attention to the whole law" as "a tool for understanding the terms of the law, not an excuse for rewriting them"). My colleagues note that elsewhere in the Act, Congress authorized states to audit MCOs and to conduct annual reviews, some of which relate to MCO payment activities. The Medicaid Act also specifies remedial measures a state can take against noncompliant MCOs, such as putting them on performance plans and imposing sanctions. These "reporting and oversight responsibilities" are proof positive, according to the majority opinion, that states are legislatively required to enforce prompt payment provisions.

This rationale proves too little. State oversight of MCOs serves a wide array of purposes, any one of which could plausibly explain Congress's imposition of managerial responsibilities. For example, as the majority opinion highlights, these oversight measures recently served to unearth an MCO's misallocation of funds. But the imposition of reporting and oversight responsibilities does not show that Congress imposed a privately enforceable duty on states to guarantee healthcare providers are timely paid. The majority opinion's rationale also proves too much. If Congress's only purpose in authorizing state audits and oversight was to require states to guarantee timely payments by MCOs to healthcare providers, why is that purpose limited to *systemic* MCO noncompliance? No reason is offered for limiting the state's mandatory enforcement duties to only the widest or worst offenders.

As a final measure, the majority opinion notes that elsewhere in the Medicaid Act, § 1396u-2(f) is referenced as the "rule for prompt payment of providers." 42 U.S.C. § 1396u-2(h)(2)(B). My colleagues suppose that such a title implies a binding obligation on states to enforce MCO payment schedules. "But headings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis." *Brotherhood of R. R. Trainmen v. Balt. & O. R. Co.*, 331 U.S. 519, 528 (1947). This title is especially unhelpful because it does not clarify whether § 1396u-2(f) is an administrative requirement that a managed contract include deadlines, or a rule that imposes a privately enforceable, managerial duty on states to guarantee all MCO payments are timely (or at least when there is "systemic" untimeliness). A passing reference in § 1396u-2(h)(2)(B) to the provision in dispute fails to alter the plain meaning of § 1396u-2(f)'s text.

The broader structure of Medicaid also shows how the majority opinion's approach conflicts with § 1396u-2(e)(4)(A). If a state is unable to resolve an MCO's "systemic" failure to timely pay healthcare providers using lesser measures, the state *must* terminate its contract with the MCO because the majority opinion holds that states "have an obligation to act under section 1396u-2(f) to secure providers' rights." My colleagues state that "a district court could not force the State to cancel a contract with an MCO." But that attempts to have it both ways, as that is the unavoidable consequence of this holding. If states have a privately enforceable duty to ensure prompt payment—at least when MCOs have systemically failed to comply with the provided payment schedule—states would be obligated to terminate MCO contracts as a measure of last resort.[5] My colleagues acknowledge as much by suggesting that "sufficiently egregious facts" could warrant such extreme measures. In other words, the majority opinion nods to the statutory tension that its broad rule creates, but then moves on without resolving it, content with the knowledge that the statutory conflict is not realized here because Saint Anthony has not *yet* sought termination of MCO contracts. That is not a tenable solution for the statutory conflict created. Even if the "worst-case scenario" existed only in the abstract, the fact that § 1396u-2(e)(4)(A) cannot be reconciled with my colleagues' construction of § 1396u-2(f) shows this is not a sound approach to statutory interpretation.

Overall, the majority opinion passes over the actual language of § 1396u-2(f) in favor of factors outside the statute and references to Congress's overall intent. But "[i]t is not a

---

[5] Again, as the Hospital's counsel conceded repeatedly at oral argument. Oral Arg. at 43:51–44:22.

proper use of the [whole act] canon to say that since the over-all purpose of the statute is to achieve *x*, any interpretation of the text that limits the achieving of *x* must be disfavored." SCALIA & GARNER, *supra*, at 168. "[N]o legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam). The majority opinion suggests Congress's chosen tools for ensuring prompt payment—private suits and arbitration by healthcare providers against MCOs, along with discretionary enforcement by states—are inadequate. *See e.g.*, Majority Op. at 24, 27 (referencing § 1396u-2(f)'s mandate that state contracts include prompt payment schedules with MCOs as a "'paper' requirement" and "a proverbial paper tiger"). But "it is not for us to substitute our view of … policy for the legislation which has been passed by Congress." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 52 (2008) (quoting *In re Hechinger Inv. Co. of Del., Inc.*, 335 F.3d 243, 256 (3d Cir. 2003)).

Paradoxically, the attempt to limit this holding to systemic MCO noncompliance, designed to alleviate the burden on district courts, will add to it. Now courts will have to make preliminary determinations on whether healthcare providers have pleaded "systemic" failures by MCOs to determine if claims are actionable. That determination must be made without statutory or judicial guidance, because "systemic" remains undefined both as a metric (for example, total number of unpaid claims, or a percentage of such claims) and the point at which that numeric threshold is crossed.

The majority opinion suggests this determination is intuitive, as evidenced by a solitary instance of the State acting against one noncompliant MCO, CountyCare. This example, my colleagues posit, shows that the State "seems to be able to

tell the difference between minor problems and systemic ones." As an initial matter, if Saint Anthony's allegations of State inaction in the face of rampant untimeliness by MCOs are true, this case proves the State cannot intuit the difference between "systemic" and "minor" failures. Even more, before the majority opinion, labels like "systemic" and "minor" were without legal significance. So, an example of the State acting against an MCO does not show that the State—much less district courts—can determine which MCOs are systemically underperforming, and which are not. Tens of thousands of untimely payments might signal a "systemic" problem while a handful of unpaid claims might not, but between these extremes lies a vast expanse of undefined terrain.

District courts are also promised that they will not need to "adjudicate issues at the claim-by-claim level"—a task my colleagues concede "would strain judicial resources and seem to conflict with the arbitration clauses in the contracts between the MCOs and Saint Anthony." But a district court can hardly decide if an MCO has systemically underperformed if it does not examine claims for untimely payment on the merits, and then determine whether the "systemic" threshold has been reached. And a district court cannot decide whether the payment schedule even applies to a group of payment claims without reaching the requisite question of whether the disputed claims are clean. Moreover, without inspecting whether individual claims are being paid on time, a district court has no metric by which to gauge the effectiveness of, or a State's compliance with, injunctions designed to ensure timely payment. Pointing to *O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2017), the majority opinion insists that all the district court must do is require the State to do "something." But my colleagues recognize that such a remedy is appropriate only

"[i]f Saint Anthony can prove its claims of systemic delay and/or underpayment," which necessarily involves adjudicating the underlying claims on the merits.[6]

In sum, the majority opinion's interpretation of § 1396u-2(f) finds no support in that statute's text and contravenes other provisions of the Medicaid Act. The attempt to limit a privately enforceable duty to "systemic" untimeliness by MCOs appears nowhere in that statute. This interpretation requires district courts to perform the arduous task of deciphering whether a healthcare provider has proved systemic abuse. That evaluation will involve some level of adjudicating the nature, timeliness, and merits of payment claims, rendering district courts the new Medicaid claims processors for the states. And as a consequence, "day-to-day" functions and enforcement are returned to the states—the precise type of fee-for-service management that MCOs were designed to avoid. This court has not previously read an implied right of action against the states under Medicaid so expansively. Of this court's few cases recognizing a private right of action under Medicaid, none has imposed a duty on the states as broad in scope, ongoing in nature, and difficult to enforce as the duty

---

[6] *O.B.* is also distinguishable. There, the statutory text of 42 U.S.C. § 1396a(a)(10)(A) imposed a duty on the State to make "medical assistance" available, which this court determined included providing nurses for children. 838 F.3d at 842–43. Here, there is no textual mooring for this holding that states have a privately enforceable duty to ensure healthcare providers are timely paid in instances where MCOs are systemically delaying payments. *See also id.* at 843–44 (Easterbrook, J., concurring) (noting the district court's injunctive order requiring the states to do something to find nurses "does not supply *any* detail," and "[t]he Supreme Court has reversed injunctions that read like this one").

the majority opinion concludes exists here.[7] Nor has any other federal circuit ever recognized a state's privately enforceable duty to guarantee timely payment under § 1396u-2(f). Jane Perkins, *Private Enforcement of the Medicaid Act Under Section 1983*, NAT'L. HEALTH L. PROGRAM 5–7 (July 30, 2021), https://bit.ly/2XaCtDY. To find such an expansive duty under § 1396u-2(f), without any textual support—in the context of Spending Clause legislation, where Congress must speak "unambiguously" with a "clear voice"—is a watershed moment.

---

[7] *See, e.g.*, *Talevski*, 6 F.4th at 720 (holding that nursing home residents have privately enforceable rights under 42 U.S.C. §§ 1396r(c)(1)(A)(ii) and (c)(2) to not be chemically restrained for disciplinary or convenience purposes, and to not be transferred or discharged from a facility unless certain criteria are met); *BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d 815, 824 (7th Cir. 2017) (holding that 42 U.S.C. § 1396a(a)(13)(A) creates a privately enforceable duty on states to provide a public process with notice and opportunity to comment as outlined in § 1396a(a)(13)(A)); *O.B.*, 838 F.3d at 842–43 (holding that provisions in the Medicaid Act impose a privately enforceable duty on states to take affirmative steps to locate and provide home nurses for children that the Illinois Department of Healthcare and Family Services have approved for home nursing); *Planned Parenthood of Ind., Inc.*, 699 F.3d at 974 (holding that 42 U.S.C. § 1396a(a)(23) creates a privately enforceable "right to receive reimbursable medical services from any qualified provider"); *Bontrager v. Ind. Fam. & Soc. Servs. Admin.*, 697 F.3d 604, 607–08 (7th Cir. 2012) (reaffirming *Miller v. Whitburn*, 10 F.3d 1315, 1318 (7th Cir. 1993), which held that Medicaid recipients have a right of action to "challenge the reasonableness of a state's decision regarding the medical necessity of a life saving procedure" under 42 U.S.C. § 1396a(a)(10)(A)).

**II**

I also part ways with my colleagues on whether the district court abused its discretion in denying Saint Anthony's motion to supplement its complaint.

Federal Rule of Civil Procedure 15(d), which governs motions to supplement pleadings, provides in relevant part that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." FED. R. CIV. P. 15(d). This court has emphasized "that there is no absolute right to expand the case in this way," and that "the district court has substantial discretion either to permit or to deny such a motion." *Chi. Reg'l Council of Carpenters v. Vill. of Schaumburg*, 644 F.3d 353, 356 (7th Cir. 2011); *see In re Wade*, 969 F.2d 241, 250 (7th Cir. 1992) (noting that a Rule 15(d) motion is reviewed for abuse of discretion); *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 743 (7th Cir. 1985) (same). Under an abuse of discretion standard of review, we will reverse "only if no reasonable person would agree with the decision made by the trial court." *Lange v. City of Oconto*, 28 F.4th 825, 842 (7th Cir. 2022) (quoting *Smith v. Hunt*, 707 F.3d 803, 808 (7th Cir. 2013)).

On appeal Saint Anthony points to Rule 15(a), which governs a motion to amend pleadings. Rule 15(a) includes the familiar language that courts "should freely give leave when justice so requires." FED. R. CIV. P. 15(a). But Saint Anthony did not file a motion to amend under Rule 15(a); rather, it

expressly filed a motion to supplement under Rule 15(d).[8] That the Hospital *could* have filed a motion under Rule 15(a) is not relevant. Rule 15(d) does not contain or otherwise invoke Rule 15(a)(2)'s mandate that courts freely grant motions to amend.

The difference between Rule 15(a) and Rule 15(d) is substantive.[9] A supplemental complaint filed under Rule 15(d) is to embrace only events that have happened since the original complaint; that is, to "bring[] the case up to date." 6A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1504 (3d ed.) Saint Anthony argues its supplemental complaint alleged facts discovered after the filing of the original complaint. But that is only partially correct. The Hospital states in its supplemental complaint that its allegations are only "based *in part* on events that have occurred since" the original complaint. (emphasis added). The supplemental complaint references Saint Anthony's earlier allegations about lack of transparency on MCO payments from January and February 2020, predating the April 2020 original complaint. Indeed, the original complaint included an entire section challenging the lack of transparency in the MCOs dealing with providing hospitals.

Saint Anthony also added a new claim in its supplemental complaint. The original complaint alleged statutory violations for the State's failure to ensure timely payments from MCOs. The supplemental complaint alleged violation of the Fourteenth Amendment's Due Process Clause and requested

---

[8] Dist. Ct. D.E. 101 ("Motion for Leave to File Supplemental Complaint").

[9] *Contra* Oral Arg. at 45:20–25.

transparency in the calculations and variables used in making payments under the managed care program *and* Illinois's separate fee-for-service program—the latter of which was not previously part of this action.

Given this case's subject matter, scope, and procedural posture, the district court was well within its discretion to decide against a massive increase in the scale of this litigation. Saint Anthony's original complaint was limited to the State's managed care program—an enormous undertaking itself. The supplemental complaint, filed nine months later after the parties had engaged in expedited discovery, added a new due process count which, as the district court correctly observed, would have entailed "whole new frontiers of discovery." That characterization is modest. The case would have expanded to include the Hospital's claim involving, for the first time, the $7 billion Medicaid fee-for-service program.[10] When a proposed supplemental complaint seeks to add a claim that will unduly delay and alter the scope of litigation, a district court may deny leave to supplemental the complaint. *See Clean Water Action v. Pruitt*, 315 F. Supp. 3d 72, 84–85 (D.D.C. 2018).

---

[10] For FY 2020, Illinois paid nearly $15 billion to managed care organizations, and nearly $6.9 billion in fee-for-service payments, according to statistics compiled by the Medicaid and CHIP Payment and Access Commission, a non-partisan legislative branch agency that provides policy and data analysis and makes recommendations to Congress, the Secretary of the U.S. Department of Health and Human Services, and the states on a wide array of issues affecting Medicaid and related programs. MEDICAID AND CHIP PAYMENT AND ACCESS COMMISSION, MACSTATS: MEDICAID AND CHIP DATA BOOK 48 (2021), https://bit.ly/3NbGn3P. The Commission's authorizing statute is 42 U.S.C. § 1396.

For my colleagues, if the district court's decision denying the motion to supplement is affirmed, "Saint Anthony could face serious problems with claim preclusion." But shortly after oral argument in our court, the State submitted a post-argument memorandum in which it stated:

> [I]f the Court affirms the district court's orders denying [Saint Anthony] leave to file its proposed supplemental complaint and [Saint Anthony] seeks to assert that additional claim in a separate action, [the State] will not assert, and accordingly waives, the defense of claim preclusion as to the additional claim alleged in plaintiff-appellant's proposed supplemental complaint.[11]

So, Saint Anthony would have been able to assert its additional claim against the State in a separate case. The State affirmatively waived any argument to the contrary.

As the district court reasoned and concluded—a decision that warrants deference under our standard of review—allowing this supplementation would not promote the economic and speedy disposition of the controversy between the parties and would cause undue delay. A reasonable person could take the view that the Hospital's motion to supplement, coming when it did, expanding the litigation to the scale that it would, and including facts Saint Anthony previously knew, should be denied. Therefore, I cannot join my colleagues in their conclusion that the district court abused its discretion in denying that motion.

---

[11] D.E. 59.

For these reasons, I respectfully concur in part and dissent in part.